**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| HANDLE PREFORMS, LLC, | ) | |
| | ) | Case No. 26-20125-jrs |
| Debtor. | ) | |
| | ) | |

**DT INVENTIONS, LLC'S NOTICE OF MOTION TO CONVERT CASE TO
CHAPTER 7 FOR CAUSE, OR IN THE ALTERNATIVE, TO DISMISS,
HEARING AND DEADLINES TO OBJECT**

**PLEASE TAKE NOTICE** that DT Inventions, LLC ("Movant") has filed its Motion to Convert Case to Chapter 7 for Cause, or in the Alternative, to Dismiss (the "Motion") and related papers with the Court seeking an order converting the above-referenced case to chapter 7.

**PLEASE TAKE FURTHER NOTICE** that the Court will hold a hearing on the Motion at 10:30 a.m. on April 21, 2026, in Courtroom 103, Federal Building, 121 Spring Street, SE, Gainesville, GA 30501, which may be attended in person or via the Court's Virtual Hearing Room. Please check the "Bankruptcy Hearing Information" link at the top of the homepage of the Court's website, www.ganb.uscourts.gov, for more information and instructions on how to participate in Court hearings. You may also review the "Hearing Information" tab on the judge's webpage for further information about the hearing.

Your rights may be affected by the Court's ruling on these pleadings. You should read these pleadings carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.) If you do not want the Court to grant the relief sought in these pleadings or if you want the Court to consider your views, then you and/or your attorney must attend the hearing. You may also file a written response to the pleadings with the Clerk at the address stated below, but you are not required to do so. If you file a written response, you must attach a certificate stating when, how and on whom (including addresses) you served the response. Mail or deliver your response so that it is received by the Clerk before the hearing. The address of the Clerk's Office is: Clerk, U.S. Bankruptcy Court, Suite 1340, 75 Ted Turner Drive, SW, Atlanta, Georgia 30303. You must also mail a copy of your responses to the undersigned at the address stated below.

[SIGNATURE ON FOLLOWING PAGE]

1

Dated: March 27, 2026

By: */s/ Lisa Wolgast*_____
Lisa Wolgast
Georgia Bar No. 773399
Lisa.Wolgast@BTLaw.com
Talia B. Wagner
Georgia Bar No. 986221
Talia.Wagner@BTLaw.com
**BARNES & THORNBURG LLP**
3340 Peachtree Rd NE, Suite 2900
Atlanta, Georgia 30326-1092
Telephone: (470) 832-7535

*Attorneys for DT Inventions, LLC*

2

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| In re:                ) | |
|                ) | Chapter 11 |
| HANDLE PREFORMS, LLC,   ) | |
|                ) | Case No. 26-20125-jrs |
|       Debtor.      ) | |
| _____) | |

**DT INVENTIONS, LLC'S MOTION TO CONVERT CASE TO CHAPTER 7 FOR
CAUSE, OR IN THE ALTERNATIVE, TO DISMISS**

COMES NOW DT Inventions, LLC ("DTI") and files this Motion to Convert Case to Chapter 7 for Cause, or in the Alternative, to Dismiss, showing the Court as follows:

**INTRODUCTION**

Debtor Handle Preforms, LLC ("Debtor") filed this case in direct response to DTI's filing of an arbitration proceeding against Debtor (American Arbitration Association Case No. 01-25-0005-7758, *DT Inventions, LLC and Practically Impossible Labs, LLC v. Handle Preforms, LLC*), which followed DTI's pre-petition termination of its license agreement with Debtor (the "Arbitration"). While the case was filed in direct response to DTI's claim, Debtor failed to disclose the pending arbitration in its schedules.

Debtor does not have any business operations, has no income, does not have any employees and cannot propose a confirmable plan. Nor does Debtor have any meaningful assets, as Debtor's assets consist of $995 in cash, certain patents (which are used by Debtor's subsidiaries), and interests in several subsidiaries. Debtor's sole purpose is to hold licenses utilized by its subsidiaries, but Debtor has never received distributions from those subsidiaries.

In contrast to its de minimis assets, Debtor's schedules reflect over $13.5 million of unsecured debt, the vast majority of which is owed to insiders and affiliates. But even more, it

3

remains unclear which creditors listed on the schedules are creditors of Debtor and which are creditors of Debtor's subsidiaries.

Because Debtor has virtually no assets and cannot file a confirmable plan as it has no business operations or income, cause exists under 11 U.S.C. § 1112(b)(4)(A) to convert or dismiss Debtor's case. Conversion is in the best interests of Debtor's estate and its creditors because conversion will enable a chapter 7 trustee to investigate intercompany transfers and insider claims for the benefit of Debtor's legitimate creditors. Furthermore, this case was filed in bad faith as evidenced by the fact that Debtor is essentially a shell company with primarily insider claims and this is really a two-party dispute between Debtor and DTI.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory predicate for the relief requested herein is 11 U.S.C. § 1112(b).

## FACTUAL BACKGROUND

### A. The Debtor and its Corporate Structure

3.      Debtor is a Delaware limited liability company. Greg Kershner ("Kershner") is the 100% owner and managing member of the Debtor. (Doc. No. 13.)

4.      Debtor's sole function is to hold intellectual property licenses, one of which was the now-terminated license from DTI, used by Debtor's subsidiaries to manufacture plastic bottles. Debtor never had any business operations, never employed a single employee, and never generated any revenue.

4

5.      Debtor owns an interest in several subsidiaries, all of which are also controlled by Kershner. Debtor owns 87.27% of HPL Contract Packaging, LLC ("Contract Packaging"), the primary operating company. Contract Packaging holds the physical manufacturing assets and is responsible for creating the plastic bottles sold to customers.

6.      Debtor also owns 100% of HPL International, LLC ("International") and HPL Services, LLC ("Services"). International is used in connection with Contract Packaging's sales to entities outside of the United States and Services is responsible for back-office functions of the various entities, including payment of employees and expenses.

7.      Kershner-related entities dominate Debtor's scheduled creditors, including the following entities:

| Creditor | Claim Amount |
|---|---|
| Kershner | $1,192,000.00 |
| InterTech | $10,238,394.01 |
| Exordium | $363,954.88 |
| ITL | $500,000.00 |
| Process Cooling Systems d/b/a Process Systems | $406,343.41 |
| QC Instruments | $64,000.00 |
| **TOTAL** | **$12,764,692.30** |

(Doc. No. 13, Schedule E/F.)

8.      During the 341 meeting, Kershner was unable to answer questions about whether the creditors listed on the schedules are creditors of Debtor or creditors of Contract Packaging, International or Services.

**B.  The License Agreement, Termination, and Arbitration**

9.      On September 1, 2019, Debtor and DTI entered into that certain License Agreement, which was amended by that certain Term Sheet dated January 14, 2020 (collectively,

the "License Agreement"), pursuant to which DTI granted Debtor an exclusive license to use DTI's intellectual property.

10. Debtor failed to pay royalties for 2024 and 2025. On or about October 24, 2025, DTI provided written notice to Debtor that, as a result of Debtor's failure to pay royalties, among other defaults, the License Agreement was terminated.

11. On or about November 17, 2025, DTI filed a Demand for Arbitration and Statement of Claims, initiating the Arbitration against Debtor asserting causes of action including breach of contract, unjust enrichment, trademark infringement, and conversion, seeking an amount not less than $3,500,000 in damages.

## C. The Bankruptcy Case

12. On January 29, 2026 (the "Petition Date"), Debtor filed a voluntary petition for relief under subchapter v of chapter 11 of the Bankruptcy Code, initiating the above-referenced case. (Doc. No. 1.)

13. Debtor's schedules reflect only $995 in total assets and $13,536,668.57 in unsecured nonpriority claims. (Doc. No. 13, Schedules A/B, E/F.)

14. As detailed above, at least $12,764,692.30 of the claims belong to insiders and affiliates, making up the vast majority of the creditor pool.

15. DTI's claim is listed as disputed with no stated claim amount.

16. Debtor's schedules show that Debtor has no secured debt, employees or revenue during the three years prior to the Petition Date. (*Id.*)

## ARGUMENT

17. Under 11 U.S.C. § 1112(b), upon request of a party in interest and after notice and a hearing, "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a

6

case under this chapter, whichever is in the best interests of creditors and the estate, for cause." 11 U.S.C. § 1112(b)(1). Section 1112(b) identifies several ways to establish cause, but the list in the statute is not exhaustive. The word "shall" is mandatory, meaning that if cause is established, conversion or dismissal is required unless the court finds unusual circumstances under § 1112(b)(2).

18.     The movant bears the initial burden of establishing cause by a preponderance of the evidence. *Matter of Moultrie*, 586 B.R. at 498. If cause is established, the burden shifts to the debtor to demonstrate unusual circumstances justifying continuation and to show that a confirmable plan is in prospect within a reasonable period. 11 U.S.C. § 1112(b)(2); *see In re YC Atlanta Hotel, LLC*, 630 B.R. 348, 358 (Bankr. N.D. Ga. 2021) (explaining that "once cause has been established, use of the word 'shall' by Congress in the subsection makes conversion mandatory"); *Matter of Oakley Grading & Pipeline, LLC*, No. 18-10743-WHD, 2019 WL 1270805, at *3 (Bankr. N.D. Ga. Mar. 15, 2019) (same); *In re Roan Valley, LLC*, No. 09-13229-WHD, 2009 WL 6498188, at *2 (Bankr. N.D. Ga. Nov. 25, 2009) (same).  Section 1181(a) lists the Chapter 11 provisions inapplicable in subchapter V cases; section 1112(b) is not included in that list. Accordingly, standard dismissal and conversion procedures apply in full.

19.     Here, two independent forms of "cause" exist to support conversion or dismissal of this case. First, cause exists under Section 1112(b)(4)(A) because there is a continuing loss or diminution to the estate and because Debtor lacks a reasonable likelihood of rehabilitation. Second, Debtor's bad faith filing and prosecuting this case justifies conversion or dismissal.

**A. Cause Exists to Convert or Dismiss this Case Under 11 U.S.C. § 1112(b)(4)(A)**

20.     Section 1112(b)(4)(A) defines "cause" to convert or dismiss a case to include "substantial or continuing loss to or diminution of the estate and the absence of a reasonable

likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). This is a two-fold inquiry. First, the Court

must determine whether there has been substantial or continuing loss to or diminution of the estate

and, if so, the Court must then decide whether there is an absence of a reasonable likelihood of

rehabilitation. *In re Vallambrosa Holdings, L.L.C.*, 419 B.R. 81, 88 (Bankr. S.D. Ga. 2009); *see

also In re Global Emergency Res., LLC*, 563 B.R. 76, 80 (Bankr. S.D. Ga. 2016); *Matter of

Moultrie*, 586 B.R. 498, 503 (Bankr. N.D. Ga. 2018); *In re Roan Valley, LLC*, 2009 WL 6498188,

at *2.

### a.   The Estate Is Suffering Substantial and Continuing Loss

21.      When evaluating whether there is substantial and continuing loss to a bankruptcy

estate, the Court must "fully evaluate the present condition of the Debtor's estate and look beyond

financial statements." *In re Motel Properties, Inc.*, 314 B.R. 889, 894 (Bankr. S.D. Ga. 2004); *see

also Matter of Moultrie* at 503 (applying same standard). "The purpose of this ground is to prevent

the debtor-in-possession from gambling on the enterprise at the creditors' expense when there is

no hope of rehabilitation." *In re Sterling Bluff Investors, LLC*, 515 B.R. 902, 919 (Bankr. S.D. Ga.

2014); *see also In re Roan Valley, LLC*, 2009 WL 6498188, at *2 (quoting *Loop Corp. v. United

States Trustee*, 379 F.3d 511, 516 (8th Cir. 2004)).

22.      The Court has "consistently held that postpetition negative cash flow coupled with

an inability to pay current expenses qualifies as a continuing loss to or diminution of the estate."

*In re Sterling Bluff* Investors, 515 B.R. at 919. Courts further recognize that "any negative cash

flow—including that resulting only from administrative expenses—effectively comes straight

from the pockets of the creditors." *In re Vallambrosa Holdings, L.L.C.*, 419 B.R. 81, 92 (Bankr.

S.D. Ga. 2009); *see also Matter of Moultrie*, 586 B.R. at 503 (finding the first prong satisfied

where the debtor's only significant asset provided no income to the estate); *In re Tri-Chek Seeds,*

*Inc.*, No. 12-11409, 2013 WL 636031, at *3 (Bankr. S.D. Ga. 2013) (finding continuing loss where "testimony and operating reports showed negative cash flow but for the cash infusions from" insider); *In re Youngwoo Moon*, No. 12-20731, 2012 WL 6727186, at *2 (Bankr. S.D. Ga. 2012) (finding continuing loss where debtor had ongoing negative cash flow and could not meet current expenses without loans from family members).

23.     The fact that insider funding may cover some current expenses does not alter the continuing-loss analysis. In *Sterling Bluff*, the court found "a continuing loss and diminution of the debtor's estate that is very substantial in nature" where the debtor had not sold any assets, was not collecting receivables, and was incurring professional fees, even though DIP financing covered some expenses. 515 B.R. at 920. The court further held that the availability of insider funding "does not alter" the continuing-loss finding. *Id.* (citing *In re Youngwoo Moon*, 2012 WL 6727186, at *2). In *Tri-Chek Seeds*, the court reached the same conclusion where operating reports showed negative cash flow "but for the cash infusions from" the debtor's sole shareholder. 2013 WL 636031, at *3.

24.     Similarly here, Debtor has no cash flow, does not currently have and has never had any operations, employees or revenue. Debtor's schedules show only $995 in quantifiable assets, plus licenses to use various patents and ownership interests in the subsidiaries (one of which is the license from DTI, which was terminated pre-petition). Meanwhile, Debtor listed unsecured claims in an amount greater than $13.5 million—the vast majority of which are insider claims—and DTI's claim of over $3.5 million as "unknown." It is without dispute that Debtor does not have the ability to fund administrative expenses in this case, including attorneys' fees and subchapter v trustee fees, or to fund a plan. Any proposed payments would have to come from the operations of Debtor's subsidiaries that have never distributed cash to Debtor or from Kershner because the

subsidiaries are no longer using DTI's intellectual property, their revenue has substantially decreased since when the License Agreement was in effect, thus diminishing Debtor's potential funding source. Accordingly, the Debtor's estate cannot pay costs of administration and is suffering a substantial and continuing loss, which supports conversion or dismissal of this case.

### b. Debtor Lacks a Reasonable Likelihood of Rehabilitation

25. Not only is Debtor's estate suffering continuing loss, but there is no reasonable likelihood that the Debtor can successfully reorganize.

26. "Rehabilitation" means "the successful maintenance or re-establishment of the debtor's business operations" and requires "the prospect of re-establishment of a business." *Vallambrosa Holdings*, 419 B.R. at 89, 93. Debtor must show it "will be reestablished on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met." *In re Motel Properties*, 314 B.R. at 895. Courts examine whether the debtor has "realistic financing sources, feasible timelines, and viable business operations." *Vallambrosa*, 419 B.R. at 93. The focus is whether the debtor's "business prospects justify continuance of the reorganization effort," and rehabilitation must be based on "actual evidence" and "must not be speculative." *Matter of Moultrie*, 586 B.R. at 503-04; *see also In re Roan Valley, LLC*, 2009 WL 6498188, at *3 (finding rehabilitation "highly unlikely" where debtor had sold only one lot in ten months and its subsidiary had "hemorrhaged resources"). In *Sterling Bluff*, the court found no reasonable likelihood of rehabilitation where the debtor "never sold a single lot, employed a single person, or erected a single building" and its plan depended on speculative future sales and ongoing insider equity infusions of uncertain availability. 515 B.R. at 920-21.

27. Like the debtor in *Sterling Bluff*, Debtor never operated a business, never had any employees, and never generated revenue. Additionally, the proposed source of funding for

administrative expenses in this case, as well as plan payments, is from the operations of Debtor's

subsidiaries and cash infusions from Kershner. But without the use of DTI's intellectual property,

the subsidiaries' revenue is diminished. Moreover, the subsidiaries never provided distributions to

Debtor, as evidenced by Debtor's lack of revenue over the past three years.

28.     Further of note is that, while the License Agreement from DTI was in place, Debtor

failed to pay amounts owed to DTI as and when due. If the Debtor and its subsidiaries were already

struggling to keep up with its obligations while enjoying the benefit of DTI's intellectual property,

how can they generate enough revenue to support a plan?

29.     Debtor cannot successfully reorganize, further supporting conversion or dismissal

of this case.

### c. There Are No Unusual Circumstances That Justify Continuation of this Case in Chapter 11

30.     Once cause is established, § 1112(b)(1) requires conversion or dismissal unless

Debtor (1) demonstrates "unusual circumstances" under § 1112(b)(2), and (2) shows that a

confirmable plan is likely within a reasonable period. *Matter of Moultrie*, 586 B.R. at 505-06

(finding no unusual circumstances and noting that where one of the grounds for cause is continuing

loss under § 1112(b)(4)(A), the debtor is precluded from relying on § 1112(b)(2)(B) in an attempt

to establish a reasonable justification for the act or omission that will be cured within a reasonable

time); *In re Roan Valley, LLC*, 2009 WL 6498188, at *5-6 (same). As discussed above, it is

unlikely that Debtor can confirm a plan within a reasonable time, if ever. Therefore, no unusual

circumstances exist that would weigh against conversion or dismissal.

### B. Cause Exists to Convert or Dismiss this Case Because it Was Filed in Bad Faith

31.     Courts recognize a debtor's lack of good faith in filing its bankruptcy case as an

independent basis of cause to convert or dismiss the case. *In re Phoenix Piccadilly, Ltd.*, 849 F.2d

11

1393, 1394 (11th Cir. 1988), the Eleventh Circuit identified six factors evidencing bad faith and held that, in addition to those factors, courts may consider "any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions.'" In *In re State Street Houses, Inc.*, the Eleventh Circuit confirmed that the *Piccadilly* factors apply in all cases and are non-exhaustive. 356 F.3d 1345, 1347 (11th Cir. 2004).

32.     The six *Piccadilly* factors are: (1) whether the debtor has a single asset or functions as a shell entity; (2) whether there are few unsecured creditors whose claims are small relative to secured interests or, as applied here, relative to insider-dominated claims; (3) whether the debtor has few or no employees; (4) whether the debtor's property or primary asset is the subject of a pending foreclosure or analogous enforcement action; (5) whether the debtor's financial condition is, in essence, a two-party dispute that can be resolved outside of bankruptcy; and (6) whether the timing of the filing evidences an intent to delay or frustrate the legitimate efforts of creditors. *Phoenix Piccadilly*, 849 F.2d at 1394-95. The expanded list of factors set forth in *In re Aurora Investments, Inc.*, 134 B.R. 982, 985–86 (Bankr. M.D. Fla. 1991), adds further considerations, including whether "the debtor appears to be merely a 'shell' corporation" and whether the debtor "is seeking to create and organize a new business rather than to reorganize or rehabilitate an existing enterprise". These additional factors closely mirror Debtor's circumstances here.

33.     More recently, in *In re Wilson*, the court applied the traditional bad-faith analysis to a Subchapter V case without modification, confirming that the bad-faith framework is fully applicable in the Subchapter V context. 666 B.R. 828 (Bankr. M.D. Ga. 2024).

34.     Applied here, the *Piccadilly* factors and the totality of the circumstances compel a finding of bad faith. The first factor is whether the debtor is a single asset real estate entity or shell entity. *Aurora Investments*, 134 B.R. at 985-86 (recognizing as an independent indicator whether

12

"the debtor appears to be merely a 'shell' corporation."). Debtor falls squarely within the definition of a shell corporation as it has no operations, no employees, no revenue, and no assets of any significance. Its sole function was to hold licenses ultimately used by its subsidiaries, including the DTI license which was terminated pre-petition. Thus, this factor supports bad faith.

35.    The second factor examines whether few unsecured claims exist as compared to debtor's secured debt. Here, Debtor does not have any secured debt. But as recognized in *State Street Houses*, the Court should "disregard unsecured debts owed to insiders, and instead consider only the amounts owed to non-insider, unsecured creditors." *In re State St. Houses, Inc.*, 305 B.R. 726, 735 (Bankr. S.D. Fla. 2002), *aff'd*, 356 F.3d 1345 (11th Cir. 2004). In *State Street Houses*, the debtor's schedules listed $17.8 million in unsecured claims, but the largest unsecured "creditor" was "the obvious affiliated insider and sister entity of Debtor." *Id.* The bankruptcy court disregarded the claim entirely, finding that what remained were modest unsecured claims that were "small in relation to the claims of the secured creditors" totaling $14.4 million. *Id.* at 735-36. The court concluded that this factor "also weighs in favor of finding the petition was filed in bad faith." *Id.* at 736.

36.    In *Sterling Bluff*, the court similarly found this factor weighed in favor of a finding of bad faith because the largest unsecured creditor was an insider entity. 515 B.R. at 916. In *Matter of Asanda Air II LLC*, the court found bad faith where the debtor had only five non-priority unsecured creditors, three of whom were insiders, reducing the case to "only two unsecured creditors" and a single active dispute. 600 B.R. at 721. Similarly, in *In re Roan Valley*, the court found that the debtor had "relatively few unsecured creditors, whose claims are dwarfed by the Movant's unsecured claim." 2009 WL 6498188, at *5. The parallel here is glaring. At least $12,764,692.30 of approximately $13.5 million in scheduled claims are held by Kershner-related

13

parties. Once insider claims are disregarded, very few legitimate third-party creditors remain, and DTI's is the single largest claim, dwarfing the others. Without the insider claims, this case is nothing more than a two-party dispute between DTI and Debtor. Additionally, it is unclear how many of the scheduled claims are actually against Debtor as opposed to against its subsidiaries, further reducing the number of unsecured creditors. This factor supports a finding of bad faith.

37.     The third factor questions whether the debtor has any employees. Here, Debtor has no employees and has never had any. Only the subsidiaries have employees, none of whom are paid by Debtor. *See Matter of Asanda Air II LLC*, 600 B.R. at 721 (finding this factor supported bad faith where the debtor's employees were tied solely to an agreement with a single counterparty); *In re Goulding Place Developers, Inc.*, 99 B.R. at 497 (noting that the debtor "has never had any employees, other than its corporate officers"). This factor undoubtedly supports a finding of bad faith.

38.     The fourth factor considers whether the debtor is subject to a foreclosure action. Here, Debtor's primary asset of any value, the License Agreement with DTI, was terminated pre-petition, and the case was filed in direct response to this termination and arbitration proceeding filed by DTI. In *In re Dixie Broadcasting, Inc.*, the court treated a chapter 11 filing during a recess to evade an imminent adverse state-court ruling as gamesmanship supporting cause to lift the stay. 871 F.2d 1023 (11th Cir. 1989). This factor supports a finding of bad faith.

39.     The fifth factor analyzes whether the bankruptcy case is really a two-party dispute between the debtor and a creditor. Here, the underlying dispute is a prepetition contract dispute between DTI and Debtor, which is already subject to a pending arbitration proceeding. Notwithstanding that Debtor testified that this case was filed in response to the arbitration, Debtor failed to include the pending arbitration on its schedules, and to date, has not amended its schedules

14

accordingly. When insider claims are set aside, this is precisely the kind of two-party dispute that *Piccadilly* contemplates. *See Matter of Asanda Air II LLC*, 600 B.R. at 721-22 (finding that the case "in its entirety depends on the resolution of the dispute between [the counterparty] and the Debtor" and that the debtor's "financial problems stem solely from the [counterparty's] State Court Proceeding and the underlying contract dispute"); *In re Roan Valley, LLC*, 2009 WL 6498188, at *5 (finding "the Debtor's bankruptcy case appears to be nothing more than another twist in a two-party dispute between the Debtor and the Movant"). Thus, this factor supports a finding of bad faith.

40.      Finally, the sixth *Phoenix Picadilly* factor requires an analysis of the timing of the filing and whether it was intended to cause delay. Debtor filed this bankruptcy case on January 29, 2026, shortly after DTI terminated the License Agreement and commenced the arbitration proceeding. While DTI offered to engage in mediation prior to the bankruptcy filing, Debtor refused to participate. Rather, Debtor sought an extension to submit its arbitrator list until February 1, 2026, at which time Debtor's counsel in the Arbitration represented that "it is anticipated the arbitration" could be reset at that time. Instead, Debtor filed this case in effort to stall injunctive relief resulting from the license termination and to stay the arbitration proceeding. *Dixie Broadcasting* confirms that timing gamesmanship, even absent traditional foreclosure, evidences improper purpose. 871 F.2d at 1023. This factor supports a finding of bad faith.

41.      The expanded *Aurora Investments* factors further support the conclusion that this case was filed in bad faith. In that case, the court dismissed with prejudice where the debtor "was a dissolved corporation, had no employees, and did not conduct any business" and the filing was timed to forestall enforcement of an adverse outcome. 134 B.R. at 986. Debtor is still an active

15

entity, but it mirrors the *Aurora Investments* debtor in every other material respect: no employees, no business operations, and a filing timed to forestall a creditor's exercise of legitimate rights.

42. The fact that there is confusion as to whether claims included on Debtor's schedules are actually claims against Debtor further highlights that the bad faith nature of this case. Similarly, when questions were raised about whether other claims were similarly claims against the subsidiaries, Debtor was unable to provide a clear answer and has not amended its schedules. This scattershot approach evidences a disregard for corporate formalities and suggests commingling and mismanagement among Debtor and its subsidiaries. These practices are the hallmark of an enterprise that does not respect the corporate form and that seeks to deploy the bankruptcy process selectively to the advantage of insiders. *See Matter of Asanda Air II LLC*, 600 B.R. at 722 (finding that the debtor's "failure to make several material disclosures evidences bad faith" and that "[t]o reap the benefit of Chapter 11, a debtor must pay the price of complete disclosure").

43. When considering the totality of the circumstances, including the *Phoenix Picadilly* factors, the expanded *Aurora Investments* factors and other evidence of bad faith, cause exists to convert or dismiss this case.

**C. Conversion to Chapter 7 Is in the Best Interest of the Creditors and the Estate**

44. Having established the existence of cause, the Court must determine whether conversion or dismissal is in the best interests of creditors and Debtor's estate. § 1112(b)(1). Here, conversion is appropriate.

45. Conversion enables the appointment of an independent chapter 7 trustee who can investigate the nature and extent of intercompany relationships and transfers. A chapter 7 trustee can further assess commingling, avoidance actions, and proper allocation of liabilities and assets and provide oversight of insider claims totaling over $12 million, including potential

16

recharacterization, equitable subordination, or objections where warranted. Additionally, a chapter 7 trustee can determine whether there are any assets of Debtor that can be monetized for the benefit of creditors.

46. In *Matter of Moultrie*, the court converted a chapter 11 case to Chapter 7, emphasizing that an independent trustee was needed to pursue recoveries where the debtor had shown itself unable or unwilling to do so. 586 B.R. at 505. The same rationale applies here. The insider-dominated creditor body, the intercompany entanglements, and the scheduling of subsidiary obligations at the parent level all suggest that estate causes of action may exist, but will likely never be pursued so long as the debtor remains in possession. *See In re YC Atlanta Hotel, LLC*, 630 B.R. at 366-67 (noting the interrelation between intercompany transfer concerns and the need for neutral oversight, even where conversion was ultimately denied on other grounds).

47. Dismissal, by contrast, would abandon the estate's potential claims, permit Debtor and its subsidiaries to restructure or dissipate assets among themselves and other affiliated entities without oversight, and potentially allow Debtor to refile. Conversion forecloses immediate refiling and ensures neutral, independent administration. Accordingly, DTI requests that the Court convert this case to chapter 7 and appoint a chapter 7 trustee.

**D. In the Alternative, the Court Should Dismiss This Case for Cause**

48. Notwithstanding DTI's preference for conversion, if the Court determines that dismissal better serves creditor interests, dismissal is warranted for the same reasons that establish cause. Debtor has no realistic prospect of rehabilitation, no business to reorganize, and no confirmable plan in sight. Continuation in subchapter V will only erode value for creditors through professional fees and administrative costs. Given Debtor's lack of any monetizable assets, this case

does not serve a bankruptcy purpose. Accordingly, the case should be dismissed if the Court

declines to convert it to chapter 7.

## CONCLUSION

For the foregoing reasons, DTI respectfully requests that the Court enter an order (i)

converting this Subchapter V case to a case under Chapter 7 for cause pursuant to 11 U.S.C. §

1112(b), or (ii) in the alternative, dismissing this case for cause pursuant to 11 U.S.C. § 1112(b),

and (iii) granting DTI such other and further relief as is just and proper.

Dated: March 27, 2026

By: */s/ Lisa Wolgast*_____
Lisa Wolgast
Georgia Bar No. 773399
Lisa.Wolgast@BTLaw.com
Talia B. Wagner
Georgia Bar No. 986221
Talia.Wagner@BTLaw.com
**BARNES & THORNBURG LLP**
3340 Peachtree Rd NE, Suite 2900
Atlanta, Georgia 30326-1092
Telephone: (470) 832-7535

*Attorneys for DT Inventions, LLC*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| HANDLE PREFORMS, LLC, | ) | |
| | ) | Case No. 26-20125-jrs |
| Debtor. | ) | |
| | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on this day, I electronically filed the foregoing with the Clerk of Court by using the Court's CM/ECF system, which will serve all counsel of record and by U.S. Mail on all parties listed on the attached mailing matrix.

Dated: March 27, 2026

/s/ *Lisa Wolgast*
Lisa Wolgast
Georgia Bar No. 773399

19

Ceci Christy
Rountree Leitman Klein & Geer, LLC
2987 Clairmont Rd, Ste 350
Atlanta, GA 30329-4435

Crown Services
309 North Duck Lake Ave
Madison Lake, MN 56063-9786

DT Inventions, LLC c/o David R. Thrasher
5151 San Felipe St.
8th Floor
Houston, TX 77056-3607

DTI
1815 Searn
Houston, TX 77007-4051

DTK
1815 Shearn
Houston, TX 77007-4051

EFI
852 Scholtz Dr.
Vandalia, OH 45377-3122

Exordium
2120 Powers Ferry Road
Suite 420
Atlanta, GA 30339-5086

Faith Distributors
605 N. Tulsa Ave.
Building 1
Oklahoma City, OK 73107-6551

Will B. Geer
Rountree Leitman Klein & Geer LLC
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, GA 30329-4435

Georgia Department of Labor
148 Andrew Young Inter. Blvd
Room 738
Atlanta, GA 30303-1733

Georgia Dept. of Labor
Suite 826
148 Andrew Young Inter. Blvd., NE
Atlanta GA 30303-1751

Georgia Dept. of Labor
Suite 910
148 Andrew Young Inter. Blvd., NE
Atlanta GA 30303-1751

Greg Kershner
3849 Beechwood Drive NW
Atlanta, GA 30327-3109

Handle Preforms, LLC
2120 Powers Ferry Road SE
Suite 430
Atlanta, GA 30339-5172

Paul Hanna
Jones Lang LaSalle Brokerage, Inc.
3344 Peachtree Road
Suite 1200
Atlanta, GA 30326-4809

Todd Eugene Hennings
Chapter 11 Subchapter V Trustee
Macey, Wilensky & Hennings, LLP
5500 Interstate North Parkway, Suite 435
Sandy Springs, GA 30328-4690

ITL
2120 Powers Ferry Road
Suite 400
Atlanta, GA 30339-5086

Integrated Plastics
12 Birminghma Ave.
Villawood, New South Wales, Australia,

InterTech
2120 Powers Ferry Road SE
Suite 420
Atlanta, GA 30339-5086

Internal Revenue Service
P. O. Box 7346
Philadelphia, PA 19101-7346

Internal Revenue Service
CIO
P.O. Box 7346
Philadelphia, PA 19101-7346

Josh Koerner
Coastal Storage Group, LLC
4025 Sunbeam Rd.
Jacksonville, FL 32257-6025

Law Offices of David M. Walker
1000 Parkwood Circle SE
Suite 900
Atlanta, GA 30339-2140

McMullan Associates
2170 Satellite Blvd.
Suite 175
Duluth, GA 30097-6260

Petainer
315 Joe Frank Porter Drive
Mount Pleasant, TN 38474-2951

Practically Impossible Labs, LLC c/o David R
5151 San Felipe St.
8th Fllor
Houston, TX 77056-3607

Process Systems
2120 Powers Ferry Road SE
Suite 400
Atlanta, GA 30339-5086

QC Instruments
2120 Powers Ferry Road
Suite 430
Atlanta, GA 30339-5172

Radius
2160 S. 170th Street
New Berlin, WI 53151-2210

William A. Rountree
Rountree Leitman Klein & Geer, LLC
Century Plaza I, Suite 350
2987 Clairmont Road
Atlanta, GA 30329-4448

SIPA
4341 International Pkwy
Atlanta, GA 30354-3910

Secretary of the Treasury
15th & Pennsylvania Avenue, NW
Washington, DC 20200

Sidel
5600 Sun Court
Norcross, GA 30092-2892

Techlong
3870 Lakefield Drive
Suwanee, GA 30024-1241

U. S. Securities and Exchange Commission
Office of Reorganization
Suite 900
950 East Paces Ferry Road, NE
Atlanta, GA 30326-1382

United States Attorney
Northern District of Georgia
75 Ted Turner Drive SW, Suite 600
Atlanta GA 30303-3309

David S. Weidenbaum
Office of the U.S. Trustee
362 Richard B. Russell Bldg.
75 Ted Turner Drive, SW
Atlanta, GA 30303-3330

Georgia Department of Revenue
Bankruptcy
2595 Century Parkway NE, Suite 339
Atlanta, GA 30345